UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
                                    :
MASHANTUCKET PEQUOT TRIBE           :
                                    :
v.                                  :   CIV. NO. 06CV1212 (WWE)
                                    :
TOWN OF LEDYARD, ET AL              :
                                    :
```

RULING ON DISCOVERY MOTIONS

_____In this action, the Mashantucket Pequot Tribe (the "Tribe")

seeks declaratory and injunctive relief regarding a personal

property tax imposed by the Town of Ledyard on gaming machines

leased by the Tribe from AC Coin.  Personal property belonging to

non-residents that is located in the Town of Ledyard is subject

to personal property taxation under Conn. Gen. Stat. §12-43.  The

statute requires each non-resident owner of tangible personal

property located in any town for three months or more to file a

declaration of such personal property with the assessors of the

town in which the property is located.

    Ledyard regards the land owned by the Tribe as part of the

taxing jurisdiction of the Town of Ledyard for purposes of

requiring non-Indians to pay the tax if they own personal

property on the reservation, including as a result of some

commercial relationship with the Tribe. [Doc. #109, Tr. 7/17/08

at 7]. [1] Ledyard argues that there is no tax exemption for non-Indians if they locate property on land that is controlled or subject to the jurisdiction of the Tribe. Id. at 8. Ledyard further contends that it makes no difference in the administration of the tax whether the subject personal property is used directly and exclusively in the gaming enterprise. Id. at 10-11.

The Tribe is obligated under its lease agreement with AC Coin to reimburse AC Coin for the tax if it becomes due and owing.

The Tribe has brought three claims for declaratory and injunctive relief from the application of the Town's property tax to the gaming machines leased from AC Coin. Each of the Tribe's claims asserts an established federal law ground for barring state taxing authority within an Indian reservation. Count One alleges that any taxation by defendants of gaming devices leased by the Tribe is completely preempted by the federal government's

---

[1]"All of the land owned by the Tribe is within the external boundaries of the Town of Ledyard. . . ." [Doc. #109, Tr. 7/17/08 at 7]. "The Town provides municipal and governmental services such as police and fire protection to residents within its borders, but those services do not extend into the Tribe's Reservation." 2d Amend. Compl. ¶11.

comprehensive regulation of Indian gaming.[2]  [Doc. #71 at ¶¶21-

23]. Count Two states a "balancing of interest" claim, alleging

"that the federal and tribal interests against imposing the tax

with respect to the gaming machines leased from AC Coin outweigh

any legitimate interest of the Town in imposing the tax, and

therefore, the tax is invalid as a matter of law. [Doc. #71 at

¶¶24-26; Doc. #85 at 2-3].  Count Three states a "sovereignty

infringement" claim, alleging "that imposing the tax with respect

to the gaming machines leased from AC Coin unlawfully infringes

on the Tribe's rights of self-government and violates the Tribe's

inherent sovereign right to make its own laws and be ruled by

them and, therefore, the tax is invalid as a matter of federal

law." [Doc. #71 at ¶¶27-32].[3]

---

[2]Plaintiff contends that whether the tax is preempted is a
question of law. Defendants assert that "[t]he 'primary
beneficiary' inquiry by definition requires a determination of
the impact of the tax relative to the Tribe's benefit;
consequently, the financial information Defendants seek is
necessary to that determination." [Doc. #89 at 3].  In its
opposition to the Motion to Compel, the Tribe states it is not
contending that the Indian Gaming Regulatory Act's ("IGRA")
requirement that the tribe be the "primary beneficiary" of the
facilities would be violated if the tax on the leased gaming
machines from AC Coin were upheld. [Doc. #85 at 11].


[3]Plaintiff contends that the complete preemption claim in
Count One presents a pure question of law, whereas the balancing
of interests and sovereignty infringement claims in Counts Two
and Three present mixed questions of law and fact. [Doc. #85 at
2].

1.　　Defendants' Motion to Compel **[Doc. #77]**

Defendants seek an order compelling answers to Interrogatory Nos. 2, 7, 9, 10, 12 and 13 and responses to Requests for Production Nos. 4, 5 and 6.

As a preliminary matter, the Tribe has agreed to produce non-privileged documents responsive to Interrogatories Nos. 2 and 7, upon entry of the Tribe's proposed Protective Order and Order to Seal Documents. [Doc. #79. 87].  The Court will address the Motion for Protective Order and Order to Seal Documents below.

In resolving defendants' motion to compel, the Court must consider what, if any, financial information is needed for the parties to address the merits of the case.


Standard of Law

The federal government's exclusive authority over relations with Indian Tribes and the semi-independent status of Tribes

> have given rise to two independent but
> related barriers to the assertion of state
> regulatory authority over tribal reservations
> and members. First, the exercise of such
> authority may be pre-empted by federal law.
> Second, it may unlawfully infringe "on the
> right of reservation Indians to make their
> own laws and be ruled by them. The two
> barriers are independent because either,
> standing alone, can be a sufficient basis for
> holding state law inapplicable to activity

4

> undertaken on the reservation or by tribal
> members. They are related, however, in two
> important ways. The right of tribal
> self-government is ultimately dependent on
> and subject to the broad power of Congress.
> Even so, traditional notions of Indian
> self-government are so deeply engrained in
> our jurisprudence that they have provided an
> important backdrop, against which vague or
> ambiguous federal enactments must always be
> measured.

White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 142-143

(1980) (internal quotation marks and citations omitted); see

Steven L. Pevar, The Rights of Indians and Tribes, at 129 (3d ed.

2002) ("The Supreme Court has [established] a two-part test to

determine which state laws may be enforced in Indian country

without congressional consent: the federal preemption and the

infringement tests."); see Richard J. Ansson, Jr., State Taxation

of Non-Indians Whom Do Business With Indian Tribes: Why Several

Recent Ninth Circuit Holdings Reemphasize the Need for Indian

Tribes to Enter Into Taxation Compacts With Their Respective

State, 78 Or. L. Rev 501, 516 (Summer 1999) (noting two part test

of preemption by federal law and unlawful infringement with

tribal sovereignty).

Federal Preemption

"The federal preemption test is easy to apply when a state

law is clearly inconsistent with some federal law or Indian

treaty, but it is more difficult to apply when Congress has not

expressly prohibited the specific action the state is attempting." Steven L. Pevar, The Rights of Indians and Tribes, at 129 (3d ed. 2002). "[I]n the field of taxation the Supreme Court has primarily invalidated state taxation of nonmember activities in Indian country under the doctrine of preemption." Richard J. Ansson, Jr., State Taxation of Non-Indians Whom Do Business With Indian Tribes: Why Several Recent Ninth Circuit Holdings Reemphasize the Need for Indian Tribes to Enter Into Taxation Compacts With Their Respective State, 78 Or. L. Rev 501, 516 (Summer 1999).

"In a number of cases [the Supreme Court] held that state authority over non-Indians acting on tribal reservations is pre-empted even though Congress has offered no explicit statement on the subject." Bracker, 448 U.S. at 151 ("Respondents' argument is reduced to a claim that they may assess taxes on non-Indians engaged in commerce on the reservation whenever there is no express congressional statement to the contrary. That is simply not the law.") (citing Warren Trading Post Co. v. Arizona Tax Comm'n, 380 U.S. 685 (1965); Williams v. Lee, 358 U.S. 217 (1959); Kennerly v. District Court of Montana, 400 U.S. 423 (1971)); see also Ramah Navajo School Board, Inc. v. Bureau of Revenue of New Mexico, 458 U.S. 832 (1982) (striking down a state tax on the gross receipts that a non-Indian construction company

received from the tribal school board for the construction of a school for Indian children on the reservation); Indian Country, U.S.A. Inc. v. Oklahoma, 829 F.2d 967 (10th Cir. 1987) (striking down State's bingo regulations and taxation of certain bingo and bingo-related activities on reservation); Warren Trading Post Co. v. Arizona State Tax Comm'n, 380 U.S. 685, 688 (1965) (precluding Arizona tax on "gross proceeds" tax on a non-Indian company which conducted a retail business on the Navajo Indian Reservation) and Mescalero Apache Tribe, 462 U.S. at 334 ("State jurisdiction is pre-empted . . . if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the state interests at stake are sufficient to justify the assertion of state authority.").  "The Court has repeatedly emphasized that there is a significant geographical component to tribal sovereignty, a component which remains highly relevant to the pre-emption inquiry; though the reservation boundary is not absolute, it remains an important factor to weigh in determining whether state authority has exceeded the permissible limits."  Bracker,  448 U.S. at 151

Preemption analysis requires a "particularized inquiry into the nature of the state, federal and tribal interests at stake . . to determine whether, in the specific context, the exercise of

state authority would violate federal law." <u>Bracker</u>, 488 U.S. at

145 (citations omitted). "State jurisdiction is preempted by the

operation of federal law if it interferes or is incompatible with

federal and tribal interests reflected in federal law, unless the

State interests at stake are sufficient to justify the assertion

of State authority." <u>New Mexico v. Mescalero Apache Tribe</u>, 462

U.S. 324, 334 (1983) (citations omitted).

"Tribal interests" identified by the Court are tribal

sovereignty, self-government, self-sufficiency and economic

development, <u>see</u> <u>Bracker</u>, 448 U.S. at 141-143, 152; <u>Mescalero</u>

<u>Apache Tribe</u>, 462 U.S. at 344; <u>Cabazon</u>, 480 U.S. at 216, as well

as interests in value "generated on the reservation by activities

in which the Tribes have a significant interest." <u>Washington v.</u>

<u>Confederated Tribes of the Colville Indian Reservation</u>, 447 U.S.

134, 155 (1980).[4]

"Federal interests" identified by the Court are interests in

enhancing tribal sovereignty and economic development, self-

government, and self-sufficiency and in exclusively regulating

areas of tribal activity as indicated by the presence of a

---

[4]"In <u>Cabazon</u>, the Supreme Court stated that 'the federal
tradition of Indian immunity from state taxation is very strong
and . . . the state interest in taxation is correspondingly weak.
Accordingly, it is unnecessary to rebalance these interests in
every case.'" <u>Crow Tribe of Indians v. State of Montana</u>, 819 F.2d
895, 901 (9th Cir. 1987) (quoting <u>Cabazon</u>, 480 U.S. at 214 n.17).

comprehensive regulatory scheme.  See Bracker, 448 U.S. at 141,

143-149; Ramah Navajo, 458 U.S. 837-42.

In California v. Cabazon Band of Mission Indians, the

Supreme Court noted that the Tribe's interests of self-

determination and economic development "obviously parallel the

federal interests."  480 U.S. at 17 (Holding that "[t]hese

policies and actions, which demonstrate the Government's approval

and active promotion of tribal bingo enterprises, are of

particular relevance in this case.  The Cabazon and Morongo

Reservations contain no natural resources which can be exploited.

The tribal games at present provide the sole source of revenues

for the operation of the tribal governments and the provision of

tribal services. They are also the major sources of employment on

the reservations.  Self-determination and economic development

are not within reach if the Tribes cannot raise revenues and

provide employment for their members. The Tribes' interests

obviously parallel the federal interests.").

The Supreme Court has balanced federal, state, and tribal

interests in diverse contexts. See Bracker,  448 U.S. 136

(balancing interests affected by State's attempt to apply motor

carrier license tax on non-Indians cutting timber on a

reservation and delivering it to a tribal sawmill); Cabazon, 480

U.S. at 216-17 (balancing interests affected by a State's attempt

to regulate on-reservation high-stakes bingo operation); <u>Indian Country</u>, 829 F.2d at 981 (same); <u>Moe v. Confederated Aalish and Kootenai Tribes of Flathead Reservation</u>, 425 U.S. 463, 483 (1976) (balancing interests affected by State's attempt to require tribal sellers to collect cigarette tax on non-Indians); <u>Colville</u>, 447 U.S. 134 (1980) (same).

## <u>Infringement Test</u>

"In 1959, the Supreme Court held in <u>Williams v. Lee</u> that a state may not infringe 'on the right of reservation Indians to make their own laws and be ruled by them.'" Steven L. Pevar, The Rights of Indians and Tribes, at 133 (3d ed. 2002) (citing <u>Williams</u>, 358 U.S. at 220). This principle has become known as the infringement test. It protects the inherent rights of Indian tribes to govern themselves. <u>Williams</u>, 358 U.S. at 223 (holding that civil suit against tribal member brought by a non-Indian to recover a debt incurred on the Navajo Reservation must be brought in tribal court.). In <u>Crow Tribe of Indians v. Montana</u>, 819 F.2d 895, 902 (9th Cir. 1987), <u>aff'd</u>, 484 U.S. 997 (1988), the Supreme Court explained that "[t]he self-government doctrine differs from the preemption analysis and is an independent barrier to state regulation . . . [and] [a]ny assertion of state authority over tribal interests must be assessed against the traditional notions

of Indian sovereignty."  The Court held in that case that "[t]he

power to tax members and non-Indians alike is an essential

attribute of self-government."  <u>Id.</u>

<u>State Taxation of Tribes and Tribal Members</u>

"Taxation has been a frequent source of controversy between

states and Indian tribes.  Freedom of a sovereign government from

taxation by another sovereign has been recognized as an important

aspect of our federal system . . . ."  American Indian Law

Deskbook, at 379 (3d ed. 2004).  Tribes use their businesses and

tax revenues to support Tribal governmental facilities and Tribal

social services.   Richard J. Ansson, Jr., State Taxation of Non-

Indians Whom Do Business With Indian Tribes: Why Several Recent

Ninth Circuit Holdings Reemphasize the Need for Indian Tribes to

Enter Into Taxation Compacts With Their Respective State, 78 Or.

L. Rev at 544, 549 (Summer 1999) (citing Testimony of W. Ron

Allen, President, National Congress of American Indians, Before

the United States House of Representatives Committee on

Resources, June 23, 1998, available in 1998 WL 12761933)). The

state, by taxing nonmembers' businesses in Indian country,

reduces revenues to the Tribe, revenues that could otherwise be

used to provide services to Tribal members. <u>Id.</u> at 545. "State

powers of taxation on Indians are severely limited, and there

remains a presumption that states are preempted from taxing

Indian activities, income, or property in Indian country." Jay
Vincent White, Taxation of Indians: An Analysis and Comparison of
New Mexico and Oklahoma State Tax Laws, 41 Tulsa L. Rev. 91, 92
(2005-06) (internal quotation marks and citation omitted); Indian
Country, 829 F.2d at 976 ("There is a presumption against state
jurisdiction in Indian country.").

The Supreme Court has "repeatedly addressed the issue of
state taxation of tribes and tribal members and the state,
federal, and tribal interests which it implicates." Cabazon, 480
U.S. at 216 n.17. "In the special area of state taxation of
Indian tribes and tribal members [the Court] has adopted a per se
rule." Id.

The Court has "recognized that the federal tradition of
Indian immunity from state taxation is very strong and that state
interest in taxation is correspondingly weak," id., stating, "it
is unnecessary to rebalance these interests in every case." Id.
"[I]n the special area of state taxation, absent cession of
jurisdiction or other federal statutes permitting it, there has
been no satisfactory authority for taxing Indian reservation
lands or Indian income from activities carried on within the
boundaries of the reservation . . . such taxation is not
permissible absent congressional intent." Id. (quoting Mescalero
Apache Tribe v. Jones, 411 U.S. 145, 148 n.17 (emphasis in

12

original)).


<u>State Taxation on Non-Indians</u>

"Courts have recognized that states have extensive jurisdiction over persons who are not members of any tribe. Nonmembers are presumptively taxable by a state with respect to on-reservation activities, but the courts will look beyond the legal incidence of the tax so that even though the tax is legally imposed on a nonmember it may be barred if it is deemed to interfere impermissibly with a federal regulatory scheme or tribal sovereignty."  American Indian Law Deskbook, at 386 (3d ed. 2004) (citing <u>County of Yakima v. Confederated Tribes and Bands of Yakima Indian Nation</u>, 502 U.S. 251, 257-58 (1992)).  Of course, "the enforcement of any state law on the reservation infringes to some extent on tribal self-government, but the Supreme Court has held that certain "minimal" infringements are permitted." Steven L. Pevar, The Rights of Indians and Tribes, at 202 (3d ed. 2002) (citing <u>Moe v. Confederated Salish and Kootenai Tribes</u>, 425 U.S. 463 (1976) (recognizing the State may impose at least minimal burdens on Indian businesses to aid in collecting and enforcing a tax); <u>Colville</u>, 447 U.S. 134.  "Taxes that apply exclusively to non-Indians-including income, personal property, real estate, gasoline, and cigarette taxes-have been upheld by

the courts under that principle." Steven L. Pevar, The Rights of Indians and Tribes, at 202 (3d ed. 2002) (citing <u>Thomas v. Gay</u>, 169 U.S. 264 (1898) (personal property tax); <u>Utah & No. Ry v. Fisher</u>, 116 U.S. 264 (1885) (real estate); <u>Loveness v. Arizona Dept of Revenue</u>, 963 P.2d 303 (Ariz. App. 1998), <u>cert. denied</u>, 525 U.S. 1178(1999) (income)).

The considerations of tribal sovereignty must be carefully weighed when taxation of non-Indians, "for transactions or activities within Indian country, is in question."  Jay Vincent White, Taxation of Indians: An Analysis and Comparison of New Mexico and Oklahoma State Tax Laws, 41 Tulsa L. Rev. at 91. "In these situations, both the tribe and the State could fairly claim an interest in asserting their respective jurisdictions." <u>McClanahan v. State Tax Commission of Arizona</u>,  411 U.S. 164, 179 (1973).

"With respect to taxing on-reservation activities by or property of non-members, the Supreme Court has identified two independent but related barriers to taxation.  First, state authority may be preempted by federal law. Second, it may infringe on the right of the reservation Indians to make their own laws and be ruled by them."  American Indian Law Deskbook, at 386-87 (3d ed. 2004) (citing <u>Bracker</u>, 448 U.S. at 136, 142; <u>Williams</u>, 358 U.S. 217). In <u>McClanahan</u>, the Supreme Court held

that state law would apply in Indian country only when the
following two conditions were met: (1) there was no interference
with tribal self-government, and (2) non-Indians were involved.
411 U.S. at 179-181 (holding Arizona state individual income tax
was unlawful as applied to reservation Navajo Indians with
respect to income derived wholly from reservation sources.).
"Because Congress is rarely explicit in preempting state law, the
preemption analysis following McClanahan often involves a
weighing and balancing of the competing state and federal
interests."  William C. Canby. Jr., American Indian Law in a
Nutshell, 89 (4th ed. West 2004).

The Supreme Court acknowledged that "[w]hen on-reservation
conduct involving only Indians is at issue, state law is
generally inapplicable, for the State's regulatory interest is
likely to be minimal and the federal interest is at its
strongest. More difficult questions arise where, as here, a State
asserts authority over the conduct of non-Indians engaging in
activity on the reservation."  Bracker, 448 U.S. at 145. In
Cabazon, a case involving high stakes bingo, the Supreme Court
stated that the presumption that state laws do not apply is not
as strong in the context of state authority over non-Indian
activity on the reservation. 480 U.S. at 416 n.18.  "The inquiry
is to proceed in light of traditional notions of Indian

15

sovereignty and the congressional goal of Indian self-government, including its overriding goal of encouraging tribal self-sufficiency and economic development." Id. at 416 (internal citations and quotation marks omitted).

"Just because the taxpayer is non-Indian does not mean that the tax is valid. This is especially true regarding pass-through taxes, which . . . are taxes that the seller collects and sends to the state but are really paid by the buyer of the goods." Steven L. Pevar, The Rights of Indians and Tribes, at 202-03 (3d ed. 2002) (citing Colville, 447 U.S. at 163 (the Supreme Court held "the State may validly require the tribal smoke shops to affix tax stamps purchased from the State to individual packages of cigarettes prior to the time of sale to nonmembers of the Tribe.")).

A state's attempt to tax a non-Indian requires a "particularized inquiry," in which a number of factors must be considered. Bracker, 448 U.S. at 142. "[M]ost importantly, where the taxable transaction occurs, the state law-defined nature of the tax-i.e., identifying what is being taxed and who bears its legal incidence; and whether the on-reservation activity taxed is centered in a commercial relationship between the taxpayer and a tribe, and, if so, the nature of any federal statutes or regulations applicable to the relationship and

whether the state provides services generally to the reservation or the tribal nonmember."  American Indian Law Deskbook, at 384, 388 (3d ed. 2004); <u>see</u> Steven L. Pevar, The Rights of Indians and Tribes, at 203 (3d ed. 2002) ("Among the factors to consider are whether the activity being taxed by the state is already regulated by the federal government, whether the state is providing any services in return for the money it seeks to collect, and whether the burden of the tax would fall on the tribe or on a non-Indian."); <u>Williams</u>, 358 U.S. at 223 ("There can be no doubt that to allow the exercise of state jurisdiction here would undermine the authority of the tribal courts over Reservation affairs and hence would infringe on the right of the Indians to govern themselves. It is immaterial that respondent is not an Indian. He was on the Reservation and the transaction with an Indian took place there.").

A few patterns have emerged.  The states are precluded from directly taxing reservation lands or reservation Indians,  <u>See County of Yakima </u>, 502 U.S. at 257; <u>Oklahoma Tax Comm'n v. Chickasaw Nation</u>, 515 U.S. 450 (1995). The Supreme Court has invalidated state taxation on non-Indian contractors doing business with tribes on reservations.  <u>See</u>, <u>e.g.</u> <u>Warren Trading Post</u>, 380 U.S. at 691 (invalidating a state gross proceeds tax imposed on reservation store owned by a non-Indian because the

vast majority of the store's customers were Navajo Indians);
Bracker, 448 U.S. 136 (1980) (invalidating a state motor carrier
registration and fuel tax imposed on non-Indian company that
hauled timber on reservation roads that had been cut from tribal
lands); Ramah Navajo, 458 U.S. at 838 (striking down a State tax
on the profits made by a non-Indian construction company that
built a school on a reservation for the tribe, stating that
"ambiguities in federal law should be construed generously, and
federal pre-emption is not limited to those situations where
Congress has explicitly announced an intention to pre-empt state
activity."); Hoopa Valley Tribe v. Nevins, 881 F.2d 657, 659 (9th
Cir. 1989) (holding that federal law preempts the imposition of
the California timber yield tax on the harvest by non-Indian
purchasers of timber owned by the tribe, preempting taxes on
"goods produced on the reservation."); Central Machinery Co. v.
Arizona State Tax Comm'n, 448 U.S. 160 (1980) (finding state
could not impose "transaction privilege tax" on the sale of farm
equipment where the sale took place on the reservation, the
contract was signed on the reservation and payment occurred
thereon, notwithstanding that the seller did not reside on the
reservation, was not licensed to trade with the Indians and the
Court found it was irrelevant that the sale was made to a tribal
enterprise rather than to the Tribe itself or that the seller did

not maintain a permanent place of business on the reservation.).

"The exercise of State authority which imposes additional burdens on a tribal enterprise must ordinarily be justified by functions or services performed by the State in connection with the on-reservation activity." Mescalero Apache Tribe, 462 U.S. at 336 (citing Ramah Navajo School Bd., 458 U.S. at 844 and n.7; Bracker 448 U.S. at 148-49; Central Machinery Co., 448 U.S. at 174)). "Thus, a State seeking to impose a tax on a transaction between a Tribe and nonmembers must point to more than its general interest in raising revenues." Id.; Confederated Tribes, 447 U.S. at 157 ("governmental interest in raising revenues . . . is strongest when the tax is directed at off-reservation value and then the taxpayer is the recipient of state services."); see Steven L. Pevar, The Rights of Indians and Tribes, at 202-04 (3d ed. 2002) ("In each case, the state provided no services in return for the taxes it sought to collect, and the burden of paying those taxes would ultimately fall on the tribes or their members."); but see Cotton Petroleum Corporation v. New Mexico, 490 U.S. 163, 169 (1989) (in distinguishing Bracker and Ramah Navajo, the Court noted that the State provided services to the Tribe, no economic burden fell on the Tribe by virtue of the state taxes, and the State regulated the spacing of oil wells on the reservation. "Thus, although the federal and tribal

regulations in this case are extensive, they are not exclusive .
. . .").


Scope of Discovery

Plaintiff objects to the financial information sought in
Interrogatories Nos. 9 and 10 and Request for Production No. 4,[5]

---

[5]Interrogatory No. 9: State the total revenues and profits
the Tribe earned from businesses or activities that are NOT
included in the Gaming Enterprise for each year and the total
amount of taxes the Tribe claims Ledyard has assessed each year
on property or activities related to these non-gaming businesses
or activities.

Interrogatory No. 10: State the total revenues and profits
the Tribe earned from its Gaming Enterprise for each year and the
total amount of taxes the Tribe claims Ledyard has assessed each
year on property or activities used or subsumed within the Gaming
Enterprise.

Request No. 4: Produce budget, financial statements and
profit and loss statements for plaintiff and for the Gaming
Enterprise, and any other similar documents that reflect the
annual revenues of plaintiff and the Gaming Enterprise and how
those revenues are expended.

"[T]he Tribe has produced information regarding the property
taxes assessed with respect to the leased gaming machines from AC
Coin and, pursuant to Interrogatory 6, property taxes assessed
with respect to property owned by the Tribe," and "information
and documents regarding general slot machine revenues, and has
stated that it is willing to produce revenues from leased gaming
machines from AC Coin, subject to the entry of an appropriate
protective order."  The Tribe is also "willing to disclose the
average daily win and profits from the Tribe's use of the leased
gaming machines from AC Coin and the total amount of capital that
the Tribe has invested in its Gaming Enterprise since 2002,
broken down by year, subject to the entry of an appropriate
protective order." [Doc. #85 at 7-8]

arguing that neither the "balancing of interests" claim in Count

Two, nor the "sovereignty infringement" claim in Count Three

involves a consideration of the relative financial impact of the

tax on the Tribe, or necessitates a weighing of this impact

against the financial impact of a loss of tax revenues on the

Town. [Doc. #85 at 6].[6]  In other words, according to the Tribe,

the only relevant question is "whether" and "not how much" the

Town's taxation of non-Indian personal property burdens tribal

sovereignty, self-government, and self-sufficiency. Defendants

argue that: "(1) financial information about the Tribe's total

revenues is necessary to measure the economic impact of the tax

that is claimed by the Tribe . . . ; [and] (2) information about

similarly situated vendors to the Tribe is essential to assessing

the effect of the tax on the Tribe and the Town . . . ." [Doc.

_____

[6]Moreover, plaintiff states,

> The State is already aware that the Tribe
> raises substantial revenues from its gaming
> enterprise, furthering Congress' policy goals
> . . . .  The Tribe has paid amounts ranging
> from $196,300,528 to $204,953,050 to the
> State of Connecticut in each of the past five
> years pursuant to the Tribe's Memorandum of
> Understanding with the State dated January
> 13, 1993, as amended which represents 25% of
> the Tribe's gross operating revenues
> generated by its slot machines in each of
> those years.

[Doc. #85 n.2].

#89 at 2].

Plaintiff argues that "the balancing of interests test does not turn on the relative impact of a state tax upon an Indian tribe." [Doc. #85 at 8]. Rather, it correctly argues that "the interests weighed under the balancing test are primarily jurisdictional rather than economic interests." [Doc. #85 at 9].

The Court has carefully considered the cases cited by the parties and finds that defendants have not shown that the broad discovery sought is warranted here. Specifically, the Court does not find support for defendants' discovery of financial information to show economic impact of a tax assessed on AC Coin or for defendants' extensive discovery requested regarding other vendors doing business with the Tribe who may be resisting the tax.

In applying the "balancing of interest" tests in Bracker, 448 U.S. 136, 148, Central Machinery Co., 448 U.S. 160 (1980), and Ramah Navajo, 458 U.S. 832, 842 n. 5, the Supreme Court did not weigh the amount of the state tax in comparison to tribal revenues. See also Warren Trading Post, 380 U.S. at 690 (holding that comprehensive regulations and statutes are "in themselves sufficient to show that Congress has taken the business of Indian trading on reservations so fully in hand that no room remains for state laws imposing additional burdens upon traders."). Rather,

the Court weighed the state's interest in raising revenue against the federal and tribal interests and the nature of the activity sought to be taxed. See Indian Country, 829 F.3d at 987 n. 9 (the "balancing test" analysis "cannot turn on the severity of a direct economic burden on tribal revenues caused by the state tax."). "This inquiry is not dependent on mechanical or absolute conceptions of state or tribal sovereignty, but has called for a particularized inquiry into the nature of the state, federal and tribal interests at stake, an inquiry designed to determine whether, in specific context, the exercise of state authority would violate federal law." Bracker, 448 U.S. at 145.

As set forth above, the factors to consider are: whether the taxed activity involves only non-Indians; whether the state provides the reservation services generally or to the taxed activity itself, because the courts have disfavored taxation when "the State had nothing to do with the on-reservation activity, save tax it." Compare, Cotton Petroleum, 490 U.S. at 186 (emphasis added) (finding State provided some amount of services to the company and the company and tribe received an "intangible benefit" from the state), with Ramah Navajo, 458 U.S. at 843 ("In this case, the State does not seek to assess its tax in return for the governmental functions it provides to those who must bear the burden of paying the tax."). "[I]n two decisions the Supreme

Court stressed the fact that a tax imposed an economic burden on a tribe and, in so doing, interfered with the federal statutory or regulatory scheme within which the taxed transaction occurs, but in others it has been reluctant to assign preemptive effect to the mere adverse economic impact of state taxes on tribal or tribal member profits." American Indian Law Deskbook, at 388 (3d ed. 2004), (comparing Ramah Navajo, 458 U.S. at 844 n.8 (noting that in Bracker, the Supreme Court found "it significant that the economic burden of the asserted taxes would ultimately fall on the Tribe, even though the legal incidence of the tax was on the non-Indian logging company.")); and Bracker, 448 U.S. at 187 (same), with, Cotton Petroleum, 490 U.S. at 186-87 ("It is of course, reasonable to infer that the New Mexico taxes have at least a marginal effect on the demand for on-reservation leases, the value to the Tribe of those leases, and the ability of the Tribe to increase its tax rate. Any impairment to the federal policy favoring the exploitation of on-reservation oil and gas resources by Indian tribes that might be caused by these effects, however, is simply too indirect and too insubstantial to support Cotton's claim of pre-emption. To find pre-emption of state taxation in such indirect burdens on this broad congressional purpose, absent some special factor such as those present in Bracker and Ramah Navajo, would be to return to the pre-1937

doctrine of intergovernmental tax immunity.")).

This Court notes that, in Cotton Petroleum, the Supreme
Court rejected a proportionality argument offered by Cotton in
which it argued the value of the services provided by the state
was disproportionate to the amount of tax the State collected
from the Tribe. "Not only would such a proportionality
requirement create nightmarish administrative burdens, but it
would also be antithetical to the traditional notion that
taxation is not premised on a strict quid pro quo relationship
between the tax payer and the tax collector." Cotton, 490 U.S. at
185 n.15.

Moreover, in California v. Cabazon Band of Mission Indians,
37 F.3d 430, 433-35, (9th Cir. 1994), a case relied on by
defendants in support of broad financial disclosure, the Court's
analysis relied on the following factors: the federal
legislation, whether the economic burden fell on the Tribe, the
nature of the activity taxed, the requirement "that the State
demonstrate a close relationship between the tax imposed on the
on-reservation activity and the state interest asserted to
justify the tax." Similarly, in Aqua Caliente and of Mission
Indians v. County of Riverside, 442 F.2d 1184, 1186 (9th Cir.
1971), another case relied on by defendants to support of broad
financial disclosure, although a "substantial amount of evidence

was received bearing upon the economic effects of the tax on the Indians," the Court of Appeals for the Ninth Circuit stated, "[w]e conclude from it what we would conclude without it, that is, a lessee can afford to pay more rent if he is not required to pay a possessory interest tax . . . and hence that the tax has an adverse economic effect upon him."

The Court disagrees with defendants that the Tribe is claiming "that any tax whatsoever violates tribal sovereignty and self-determination" and clearly the case law directs otherwise. [Doc. #89 at 5].

Nor is the Court persuaded that the Town's economic interests are being harmed by being deprived of the tax owed by AC Coin and, presumably, other non-Indian vendors. See Bracker, 448 U.S. at 150 (The State "refer[s] to a general desire to raise revenue, but we are unable to discern a responsibility or service that justifies the assertion of taxes imposed for on-reservation operations conducted solely on tribal and Bureau of Indian Affairs roads."); Ramah Navajo, 458 U.S. at 845 ("The State's ultimate justification for imposing this tax amounts to nothing more than a general desire to increase revenues."); Colville, 447 U.S. at 157 ("The State also has a legitimate governmental interest in raising revenues, and that interest is likewise strongest when the tax is directed at off-reservation value and

when the taxpayer is the recipient of state services."); Indian
Country, 829 F.2d at 987 ("The State has a general interest in
raising revenue. That interest alone, however, is insufficient to
justify taxing this tribal activity."). The jurisdiction analysis
must proceed by considering the factors set forth by the Supreme
Court to determine if that state may impose the tax.

Nor is the Court persuaded by the Ninth Circuit's recent
decision in Barona Band of Mission Indians v. Yee, No. 06-55918,
2008 WL 2440528 (9th Cir. June 18, 2008), to permit discovery on
the "relative impact of the challenged tax."[7] [Doc. #98 at 2].
Rather, the Court, in reviewing the Supreme Court's decisions in
Bracker and Rahmah Navajo, finds on this record that defendant's
request for all of the Tribe's financial statements and
agreements is not warranted by the need to apply the balancing
test factors.[8] See Conn. Rev. Rul. 95-11 (Nov. 29, 1995)

---

[7]On June 24, 2008, defendants filed a copy of the Ninth
Circuit's recent decision in Barona Band of Mission Indians v.
Yee, No. 06-55918, 2008 WL 2440528 (9th Cir. June 18, 2008),
asking the Court to consider the supplemental authority. [Doc.
#98]. Plaintiff filed a response on July 1, 2008. [Doc. #99]. The
Court heard additional argument on July 17, 2008. [Doc. #106].

[8]The Tribe agrees to provide the following information
subject to a protective order: (1) the Tribe's lease agreements
with AC Coin; (2) the amount of rent paid to AC Coin; (3) the
Tribe's revenues and profits from the slot machines leased from
AC Coin; and (4) the amount of the Tribe's capital investment in
its Class II and Class III gaming facilities and operations.
[Doc. #99 at 2].

(applying Bracker and Rahman Navajo in finding Connecticut's sales and use taxes preempted by federal law as applied to non-Indians performing construction projects for tribes related to Indian gaming); Conn. Rev. Rul. 2002-3 (Apr. 15, 2002) ("consistent with Ruling No. 1995-11 and in accordance with established principles of federal Indian law," "[w]ith regard to rentals of tangible personal property where delivery of the tangible personal property takes place within Indian country of the Tribe, Ruling No 95-11 stated that "[s]uch rentals will not be subject to use tax as long as the Tribe or its members do not rent the property with the intent to use it outside of Indian country and then so use it.").

The Tribe states that the activity or the property being taxed here are the gaming machines leased by AC Coin to the Tribe for exclusive use in its on-reservation gambling enterprise. [Doc. #109, Tr. 7/17/08 at 69]. The question, according to plaintiff, is whether "the direct economic burden [of the tax is] falling on the Tribe?" [Doc. #109, Tr. 7/17/08 at 72] (citing Bracker, Ramah, Central Machinery, and Warren Trading); see Oklahoma Tax Commission v. Chickasaw Nation, 515 U.S. 450,458 (1995) ("[t]he initial and frequently dispositive question in Indian tax cases . . . is who bears the legal incidence of the tax."); Conn. Rev. Rul. 1995-3 at 4 ("[w]hen the legal incidence

28

of [a] tax is to be on a tribe or its members for a sale within Indian country, state regulation of the transaction is categorically prohibited."). The Tribe contends, and the Court agrees, that Barona does not entitle defendant to the financial information about contracts with all the Tribe's other vendors. [Doc. #109 at 67].

Moreover, the Court is not persuaded that the Tribe is "rigging," "scheming," or "manipulating" its contracts with non-Indians to reimburse vendors for state taxes. See Bracker, 448 U.S. at 140 (Supreme Court noted without further comment that, "[t]he Tribe agreed to reimburse Pinetop for any tax liability incurred as a result of its on-reservation business activities, and the Tribe intervened in the action as a plaintiff."); Ramah Navajo School Bd., 458 U.S. at 835 (The Board reimbursed the construction company for the state gross receipts taxes. The second contract between the construction company and the Board included a clause "recognizing that the Board could litigate the validity of te tax and was entitled to any refund."). A fair reading of Conn. Rev. Rul. 93-11 at 4-5 (Nov. 29, 1995) establishes that the Department of Revenue Services recognized that, "[s]ince 1988, the regulation of gaming on Indian lands has been completely the province of the federal government under the Indian Gaming Regulatory Act, 25 U.S.C. §§2701 et seq." With

regard to rentals of tangible personal property, "where delivery of the tangible personal property takes place within Indian country by the Tribe or its members," Rev. Rul. 95-11 determined that "sales tax on the Company's rentals of tangible personal property . . . is federally preempted because the legal incidence of the tax falls on the Indians on their own land. Such rentals will not be subject to use tax as long as the Tribe or its members do not rent the property with the intent to use it in Connecticut outside of Indian country and then so use it." Conn. Rev. Rul. 95-11 at 3. "The essential elements of this [balancing] test are that when the direct economic burden of the tax on a sale within Indian country falls on an Indian tribe, affecting a program subject to extensive federal regulation, the federal and/or tribal interests generally outweigh those of the state, and the imposition of the state tax is prohibited." Conn. Rev. Rul. 95-11 at 4 (citing Ramah Navajo School Bd., 458 U.S. at 842-45 and Bracker, 448 U.S. 141-53); see also Conn. Rev. Rul. 2002-3 at 7 ("Purchases of tangible personal property by the Tribe where title to the tangible personal property passes to the Tribe within Indian country of the Tribe or rentals of tangible personal property by the Tribe where delivery of the tangible personal property is made to the Tribe within Indian country of the Tribe are not subject to Connecticut sales tax. However, such

purchases or rentals will be subject to Connecticut use tax if the Tribe purchases or rents the tangible personal property with the intention of using it outside of Indian country of the Tribe and actually so uses it.").

Accordingly, with these factors in mind, the Court finds that discovery of the Tribe's broader financial information which defendants seek in Interrogatories Nos. 9 and 10 and Request for Production No. 4 is not warranted on this record. The Motion to Compel responses to Interrogatories Nos. 9 and 10 and Request for Production No. 4 is **DENIED** on this record.


Other Lessors of Gaming Equipment

Plaintiff further objects to Interrogatory No. 12 and Request for Production 5.[9] Defendants argue that the Town's economic interests are harmed by being deprived of the tax owed by AC Coin and other vendors and lessors to the Tribe who are

_____

[9]Interrogatory No. 12: Identify all lessors from whom the Tribe leases or has leased gaming equipment (excluding AC Coin), the total lease amounts paid to each lessor each year and the amount of Connecticut property taxes the Tribe claims has been assessed on the leased property each year.

Request for Production No. 5: Produce all agreements concerning in any way any arrangements identified in response to interrogatory 12 from the State's First Set of Interrogatories.

similarly situated to AC Coin.[10] [Doc. #89 at 8].

Within ten (10) days, defendants will provide a list of the twenty-five (25) owners of personal property who have a commercial arrangement with the Tribe and who filed a tax declaration with the Town of Ledyard. The Tribe will review the list and provide copies of the contracts of all listed vendors who lease gaming machines to the Tribe, subject to a protective order.[11]  The Motion to Compel responses to Interrogatory No. 12 and Request for Production No. 5 is **GRANTED** in part and **DENIED** in part as set forth above.

---

[10]Indeed, at oral argument defendants stated that this lawsuit "is not just about AC Coin."  There

> is really no difference between AC Coin and WMS Gaming, and perhaps between WMS Gaming and Uno Pizzeria . . . or Hard Rock Café. When you add them all up, it is an amount of tax that is crushingly significant to the Town, but I'm not going to stand here and tell you that the Town is in this fight for $10,000.  It's in this fight for all the personal property tax through the scheme now employed that would be avoided this year and every year thereafter, and that is a matter that perhaps goes to the economic viability of the Town itself.

Doc. #109, Tr. 7/17/08 at 30-31.

[11]At oral argument, defendants posited that three (3) of the twenty-five (25) entities who have filed declarations were involved in leasing gaming equipment. [Doc. #108, Tr. 7/17/08 at 29].

<u>MGM and Other Unspecified "Non-Tribal Business"</u>

Defendants' requests regarding MGM and other unspecified "non-tribal businesses" are also denied.[12]  As set forth above, defendants fail to establish how this information is relevant to responding to the Tribe's challenge of the legality, under federal law, of the imposition of Connecticut's tax on gaming machines leased from AC Coin. At oral argument, defendants withdrew their request. [Doc. #109, Tr. 7/17/08 at 45-46].  The Motion to Compel responses to Interrogatory No. 13 and Request for Production No. 6 is **DENIED** on this record.

2.  <u>Plaintiff's Motion for Protective Order and to Seal</u>
    <u>Documents</u> **[Doc. ##79, 87]**

Plaintiff moves for a protective order to protect the Tribe's confidential and proprietary documents and information,

---

[12]<u>Interrogatory No. 13</u>: The Tribe alleges that Ledyard's tax harms it economically. Please quantify that economic harm by identifying all property (excluding gaming equipment identified in response to Interrogatory 12) and all non-tribal businesses conducted on Reservation that are taxed by Ledyard, including but not limited to all items of personal property that MGM has located or the Tribe anticipates MGM will locate on Reservation under MGM's agreements with the Tribe and describe in detail any agreement or understanding the Tribe has with MGM regarding its personal property tax liability.

<u>Request for Production No. 6</u>: Produce all agreements concerning in any way agreement or understanding identified in response to interrogatory 13 from the State's First Set of Interrogatories.

pursuant to Fed. R. Civ. P. 26(c). [Doc. #79], Plaintiff further seeks an order sealing documents, pursuant to D. Conn. L. Civ. R. 5(e)4(b). [Doc. #87].

Federal Rule of Civil Procedure 26(c)(1)(G) provides for the entry of a protective order, "requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way." Fed. R. Civ. P. 26(c)(1)(G). "This provision also confers broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required. However, the party seeking the protective order has the burden of proving that there exists good cause for a protective order. Indeed, broad allegations of harm unsubstantiated by specific examples will not suffice." Favale v. Roman Catholic Diocese of Bridgeport, 235 F.R.D. 553, 555 (D. Conn. 2006) (internal quotation marks and citations omitted).

The subject documents and information the Tribe seeks to protect include: (1) financial information related to the Tribe's gaming operation; and (2) documents and financial information relating to the proprietary business relationship between the Tribe and AC Coin. In support of the motions, plaintiff submitted the affidavits of Mark Ford, Vice President of Finance for the Mashantucket Pequot Gaming Enterprise, and Herbert "Skip"

Camp, Director of Technical Slots for the Mashantucket Pequot
Gaming Enterprise. The Tribe views both categories of documents
and information to be confidential and proprietary. Ford Aff.
¶¶3-5; Camp Aff. ¶¶3-4. The Tribe does not disclose to the public
the documents and information sought by the State due to the
highly confidential and proprietary nature of the financial and
business information. The Tribe deems all of its financial and
business records, documents and information to be confidential
and proprietary because disclosure could result in the loss of
revenues, profits, customers and market share, putting the Tribe
at a competitive disadvantage in the gaming industry. Ford. Aff.
¶3; Camp Aff. ¶3. The Tribe also deems this information
confidential and proprietary because disclosure to the Tribe's
other vendors could damage the Tribe's negotiating position in a
competitive industry and could damage or destroy the Tribe's
business relationship with AC Coin. Ford Aff. ¶4-6; Camp Aff.
¶4-6. The Tribe has taken steps to preserve the confidentiality
of these documents, including carefully limiting access to the
documents and information, and requiring all employees to sign
confidentiality agreements. Ford Aff. ¶¶5-6; Camp Aff. ¶¶5-6.

On this record, the Court finds good cause to grant
plaintiff's protective order. **[Doc. #79].** The Tribe will clearly
designate the subject documents as confidential and subject to a

protective order.

On the same basis, the Court finds good cause to grant plaintiff's Motion to Seal, albeit, on a limited basis. **[Doc. #87].** The proposed limitations on the use of the Tribe's confidential and proprietary documents and information are reasonable and appropriate. To the extent that defendant would like to use a document subject to the protective order, it will provide advance notice so that plaintiff may make an appropriate application to seal with the Court, supported by specific information regarding the grounds for the proposed sealing. The Court will consider requests to seal on a document-by-document basis, in light of D. Conn. L. Civ. R. 5(e), regarding sealed documents.


CONCLUSION

Defendants' Motion to Compel Answers and Production of Documents **[Doc. #77]** is **GRANTED** in part and **DENIED** in part on the current record and in accordance with this ruling.

Plaintiff's Motion for Protective Order and to Seal Documents **[Doc. #79, 87] is GRANTED** in part and **DENIED** in part in accordance with this ruling.

Protective Order

The parties will confer and propose a joint protective order

within ten (10) days.  If the parties cannot agree on a joint
protective order, they will contact the Court to schedule a
telephone conference.  Five (5) days prior to the telephone
conference, each party will submit a proposed protective order to
the Court.

Privilege Log

If plaintiff is withholding information on the grounds of
privilege, it will file a privilege log within ten (10) days,
pursuant to Fed. R. Civ. P. 26(b)(5) and D. Conn. L. Civ. R.
37(a)(1).[13]

Amended Scheduling Order

Currently, all discovery including deposition of expert
witnesses was to have been completed by May 30, 2008. [Doc. #58].

In light of this ruling, the parties will confer and file a
proposed amended scheduling order withing ten (10) days. If the
parties cannot agree on an amended scheduling order, they will
contact the Court to schedule a telephone conference. Five (5)
days prior to the telephone conference, each party will submit a
letter, specifying the remaining discovery to be completed, the
number of witnesses to be deposed with proposed dates for the

---

[13]Plaintiff stated that it will produce "non-privileged
documents" upon entry of a protective order.  Any production of
documents must also be accompanied by a privilege log.

37

depositions, a proposed schedule for disclosure of expert witnesses and their depositions; and propose an amended scheduling order.[14]

This is not a recommended ruling. This is a discovery ruling and order which is reviewable pursuant to the "clearly erroneous" statutory standard of review. 28 U.S.C. § 636 (b)(1)(A); Fed. R. Civ. P. 6(a), 6(e) and 72(a); and Rule 72.2 of the Local Rules for United States Magistrate Judges. As such, it is an order of the Court unless reversed or modified by the district judge upon motion timely made.

SO ORDERED at Bridgeport this 16th day of September 2008.

_____/s/_____
HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE

---

[14]The parties will confer and determine the availability of the witnesses for deposition along with a schedule.