**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **MASHANTUCKET PEQUOT TRIBE,** | : | **No. 3:06cv1212 (WWE)** |
| **Plaintiff,** | : | |
| **v.** | : | |
| | : | |
| **TOWN OF LEDYARD,** | : | |
| **PAUL HOPKINS, Tax Assessor** | : | |
| **of the Town of Ledyard,** | : | |
| **JOAN CARROLL, Tax Collector** | : | |
| **of the Town of Ledyard, and STATE** | : | |
| **OF CONNECTICUT,** | : | |
| **Defendants.** | : | |

**RULING ON CROSS MOTIONS FOR SUMMARY JUDGMENT,**
**and MOTION IN LIMINE**

This case concerns the authority of defendants State of Connecticut (the "State")
and the Town of Ledyard (the "Town")[1] to tax slot machines owned by non-Indian
entities leased by plaintiff Mashantucket Pequot Tribe ("Tribe").  In counts one and two,
the Tribe complains that the Town's property tax is preempted by federal law; in count
three, the Tribe claims that the tax interferes with its ability to exercise its sovereign
functions.  The parties have filed cross-motions for summary judgment.  For the
following reasons, the plaintiff's motion for summary judgment will be granted.
Defendants' motion in limine and motions for summary judgment will be denied.

---

[1]The Town includes Paul Hopkins, Tax Assessor, and Joan Carroll, Tax Collector.

**FACTUAL BACKGROUND**

The Tribe is federally recognized by pursuant to 25 U.S.C. § 1758(a).  The Mashantucket Pequot Tribe Reservation (the "Reservation") borders the Town of Ledyard.

The Tribe operates a gaming operation on its Reservation pursuant to the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721 ("IGRA") and the Final Mashantucket Pequot Gaming Procedures ("Gaming Procedures").  Gaming is the Tribe's principal source of revenue and provides the funds to support government services and the general welfare of the Tribe and its members.  The Tribe does have other revenue sources including a sales tax, a hotel occupancy tax, and an admissions tax for on-Reservation transactions.

The Tribe's governing body is the Tribal Council.  The Tribal Council reviews taxes on hotel occupancy, beverages, food, sales, and admissions imposed by the Tribe pursuant to the General Revenue and Taxation Code.

The Mashantucket Pequot Gaming Enterprise is an arm of the tribal government that conducts gaming operations at Foxwoods Resort Casino and MGM Grand at Foxwoods.  Both of these operations are located on the Reservation.

Since 2002, the Tribe has invested more than $1.42 billion of capital into its gaming operations.  Pursuant to the Gaming Procedures, the Tribe has reimbursed the State for law enforcement regulatory services in the amount 56.8 million.  The Tribe is also obligated to submit 25% of its gross operating revenues from its video facsimile games to the State pursuant to a negotiated Memorandum of Understanding ("MOU").

Slot machines are a crucial part of the Tribe's gaming operations.  Relevant to

2

this action, the Tribe has entered into equipment lease agreements with various gaming

device manufacturers, including Atlantic City Coin & Slot Co. ("AC Coin") and WMS

Gaming Inc. ("WMS").

AC Coin

AC Coin is required by a contractual relationship with International Game

Technology to make its proprietary games available for lease only.  The proprietary

games are typically the most popular games at casinos.

The Tribe first leased slot machines from AC Coin in 1997 or 1998.  The earliest

lease on record between AC Coin and the Tribe is dated October 11, 2000.  Each lease

between AC Coin and the Tribe has been negotiated and executed on the Reservation.

For its early leases with the Tribe, AC Coin used an agreement that provided:

"Any and all taxes and license fees applicable to the use and operation of the Game(s)

shall be paid by Casino."  The leases also required the lessee to indemnify AC Coin for

any loss or liability of any kind arising from "the use, operation and possession of the

Game(s)."

Since 2001, the leases between AC Coin and the Tribe have provided that:  (1)

the Tribe is not subject to state and local taxes; (2) AC Coin or WMS will not file any

declaration or pay any taxes with respect to gaming machines leased to the Tribe; and

(3) the Tribe will indemnify and hold harmless AC Coin and WMS in the event either

was determined to be legally obligated to pay any such taxes.

In 2003 or 2004, AC Coin filed a property tax declaration listing the gaming

machines leased to the Tribe with the Town of Ledyard.  This filing resulted from a

misunderstanding with AC Coin's outside tax accounting firm.  As a result of this

3

mistaken filing, the Town of Ledyard has since assessed personal property taxes on the gaming machines leased to the Tribe based on the 2003 Grand List.

In 2004, the Tribe challenged the Town's assessment of the property tax.  The Town rejected that challenge, and AC Coin resolved to pay the tax rather than take an administrative appeal or commence litigation.

In 2006, AC Coin pursued an administrative appeal of the Town's assessment on the basis that the Town does not have authority to assess personal property taxes on gaming machines leased by the Tribe for exclusive use within the gaming enterprise on the Tribe's Reservation.  The Town's Board of Assessment Appeals rejected that appeal.

<u>WMS</u>

WMS is a Delaware corporation headquartered in Illinois that manufactures and distributes gaming devices to gaming customers.  WMS leases certain of its gaming devices, although it does sell some of such devices.  The devices that are in high demand and can be marketed for a premium price tend to be available only by lease.

In 1998, the Tribe started leasing gaming devices from WMS.  The leases between WMS and the Tribe have been negotiated and signed on the Reservation.

Generally, the leases between the Tribe and WMS provide that the taxes on the leased equipment should be paid by the Tribe.  An addendum to the lease dated October 15, 1998 states:

> The Agreement shall be amended to the extent that paragraph, TAXES, shall be stricken and of no force or effect whatsoever and replaced with, "Casino represents that it is not subject to any state or local taxes for any services and sales or leases occurring at Casino and agrees to provide a tax certificate certifying this to

4

WMS. . . . In the event WMS becomes legally obligated to file
and/or pay taxes, WMS agrees to immediately notify Casino of
such obligation and to reasonably cooperate with Casino in
contesting such tax filing and/or payment if so requested by Casino.
Notwithstanding the foregoing, Casino agrees to hold harmless
and/or reimburse WMS within thirty (30) days for any taxes or any
related cost or expense paid in accordance with this Section.

In 2004, WMS negotiated with the Tribe for new master lease agreements.   In

2005, WMS entered into two new leases with the Tribe:  (1) a Wide Area Progressive

(WAP) Games[2] Lease; and (2) a Master Lease Agreement for all non-WAP games.

The WAP Games Lease provided:

Any and all taxes, license or permit fees imposed by a
governmental entity with competent jurisdiction, related or
applicable to the installation or operation of the Equipment at
Customer's location such as sales, use and property taxes, but
excluding any taxes based on WMS' income and any gaming
license fees, shall be the sole responsibility and obligation of the
Customer.  WMS shall file any related jurisdictional reports as
required by law and remit the full amount of tax due . . . . Customer
represents that it is not subject to any state or local taxes for any
services and sales or leases occurring at Customer's premises and
agrees to provide a tax certificate certifying this to WMS upon
request.  WMS agrees not to file with local towns or any other
applicable jurisdiction, including specifically the Town of Ledyard, a
list of property or equipment to pay such tax except in the event
that it is legally obligated to do so.  In the event WMS becomes
legally obligated to file and/or pay taxes, WMS agrees to
immediately notify Customer of such obligation and to reasonably
cooperate with Customer in contesting such tax filing and/or
payment through appropriate legal process if so requested by
Customer.

The Master Lease provided:

---

[2]WAP games are a category of games in which WMS, as the provider, is responsible for
the jackpot.

> Casino represents that it is not subject to any state or local taxes
> for any services and sales or leases occurring at Casino's premises
> and agrees to provide a tax certificate certifying this to WMS upon
> request.  Upon reliance on the aforementioned tax certificate, WMS
> agrees not to file with the local towns or any other applicable
> jurisdiction, including specifically the Town of Ledyard, a list of
> property or Equipment provided under the Agreement or to pay
> such tax with respect to such Equipment except in the event that
> WMS is legally obligated to do so.  In the event WMS becomes
> legally obligated to file and/or pay taxes, WMS agrees to
> immediately notify Casino of such obligation and to reasonably
> cooperate with Casino in contesting such tax filing and/or payment
> through appropriate legal process if so requested by Casino.

On October 28, 2004, WMS filed a property tax declaration that was the result of

a misunderstanding by an outside tax accountant and turnover of personnel in its tax

department.  On August 18, 2006, WMS paid the property tax under protest, and it

informed the Town that it would not pay the tax thereafter.

WMS has not paid property taxes on the gaming machines leased to the Tribe

since at least 2006.[3]  On June 23, 2008, the Town sued WMS in Connecticut state court

to collect unpaid property taxes.

Revenues from personal property taxes are added to the Town's general

revenues, which fund services itemized in the Town's budget.

The Tribe and its members pay property taxes on property located outside of the

Reservation that is within the Town.

---

[3]WMS paid property taxes in 2001, 2003 and 2006.

## DISCUSSION

Motion In Limine

Defendants move to exclude the testimony of plaintiff's expert John C. Deane on the grounds that it is (1) inadmissible pursuant to Federal Rule of Evidence 402 as irrelevant and (2) inadmissible pursuant to Federal Rule of Evidence 702 as testimony from an unqualified expert.

Deane is the CEO of the Alta Group, an international management consulting firm that focuses on equipment leasing and finance.  The Tribe offers his testimony to support its assertion that the provisions of the gaming leases for payment of property taxes and indemnification are standard practice in the gaming industry.  Deane's report represents that based on his "extensive personal experience" with gaming equipment leases "the issues of sales, use, and property taxes for commercial equipment lease of gaming equipment" do not differ from leases of any other equipment category.

Defendants represent that Deane's report addresses customary practices in the general commercial industry and is not specific to the leasing of gaming equipment. Defendants maintain that Deane's testimony and report must be considered irrelevant due to Magistrate Judge Fitzsimmons's ruling that denied defendants discovery of the Tribe's general commercial leasing arrangements other than for gaming equipment.  In its denial of defendants' motion to compel, the Court stated that defendants had failed to establish how such information was relevant to the Tribe's present challenge.

Expert evidence relative to the standard gaming leases in the industry is relevant to this plaintiff's proof that the leases are reasonable and customary.  Defendants' argument based on the discovery ruling is unpersuasive.  The Court's ruling prevented

defendants from obtaining all of plaintiff's non-gaming leases but did not preclude defendants from investigating customary leasing practices in the gaming industry. Defendants had the opportunity to obtain their own expert on the subject or to depose Deane; defendants refrained from so doing.  The Court will not grant the motion in limine on the basis of Rule 402.

Further, the Court rejects defendants' contention that Deane is not a qualified expert in the field of gaming equipment leases.  Deane wrote and published his graduate thesis, "Financing the Casino Gaming Industry;" he worked as CEO of the largest non-manufacturer lessor of slot-machines; and he is now CEO of a consulting company that advises clients in the gaming industry as well as other areas.  In light of Deane's 39 years of experience in the relevant industry, the Court finds that he is a qualified expert.

The motion in limine will be denied.

Cross Motions for Summary Judgment

A motion for summary judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).

The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute.  Am. Int'l Group, Inc. v. London Am. Int'l Corp., 664 F.2d 348, 351 (2d Cir. 1981).  In determining whether a genuine factual issue exists, the

court must resolve all ambiguities and draw all reasonable inferences against the moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

If a nonmoving party has failed to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, then summary judgment is appropriate.  Celotex Corp., 477 U.S. at 323.  If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met.  Liberty Lobby, 477 U.S. at 24.  The same standard applies to review of cross motions for summary judgment.

Standing

The Town argues that the Tribe does not have standing to bring this action challenging the property tax on the leased gaming equipment.  The defense maintains that plaintiff cannot establish an injury sufficient to support its assertion of standing.

The doctrine of Article III standing requires a litigant to demonstrate that (1) the litigant suffered actual or threatened injury as a result of the illegal conduct of the defendant, (2) the injury is fairly traceable to the challenged action, and (3) the injury is redressable by a favorable decision.  Valley Forge Christian College v. Americans United for Separation of Church and State, 454 U.S. 464, 472 (1982).

9

Defendant Town asserts that plaintiff cannot demonstrate standing through its self-inflicted injury brought on by its decision to reimburse AC Coin and WMS for property taxes imposed by the Town.[4]   The Tribe counters that (1) Supreme Court precedent, White Mountain Apache v. Bracker, 448 U.S. 136, 140 (1980) and Ramah Navajo School Bd., Inc. v. Bureau of Revenue of New Mexico, 458 U.S. 832, 838 (1982), each involved an Indian tribe's contractual obligation to reimburse a non-Indian entity for a state tax; (2) the obligation to reimburse the vendors is not a self-inflicted injury because the Town has actively contributed to the injury by enforcing its property tax; (3) the Tribe has sustained an injury by having to direct funds to challenge the tax; and (4) the Tribe has a claim of injury based on infringement of its sovereignty and right to govern within its borders.  Regardless of plaintiff's standing based on a financial injury, the Court finds that the Tribe can assert "a discrete claim of injury" based on its substantive interest in self-government with respect to the state's authority to impose taxation "so as to confer standing upon it."  Moe v. Confederated Salish and Kootenai Tribes of Flathead Reservation, 425 U.S. 463, 469 n.7 (1976).

Further, the Connecticut statutes empower the Town to enforce its tax regulation in the event of unpaid taxes by encumbering the games with liens and confer upon the Town the right to enter the Reservation to take possession of the games.  Conn. Gen.

---

[4]The Mashantucket Gaming Enterprise conducts the gaming operations for the Tribe, and it has been held to be an integral part of the Tribe with all the rights and immunities of the Tribe.  Worrall v. Mashantucket Pequot Gaming Enter., 131 F. Supp. 2d 328, 330 (D. Conn. 2001) (Gaming Enterprise is arm of the Mashantucket Pequot Tribe).  In this Memorandum of Decision, the Court refers only to the Tribe.

Stat. §§ 12-155, 12-195b, and 12-195e.[5]  Thus, the Town's tax regulation presents an injury to the Tribe's interest in sovereignty and self-government as well as an imminent threat to its autonomy within its physical boundaries.  See Barona Band of Mission Indians v. Yee, 528 F.3d 1184, 1191 (9th Cir. 2008) (recognizing that a tribe has a right to territorial autonomy and that tribal interests are implicated by a tax on work performed by a non-Indian on tribal territory).

Recent decisional law recognizes that infringement upon tribal sovereignty is a harm that gives rise to an Indian tribe's standing.  See, e.g., Prairie Band of Potawatomi Indians v. Pierce, 253 F.3d 1234, 1242 (10th Cir. 2001) (State's refusal to grant recognition to tribally-issued motor vehicle registrations and titles is an "obvious harm" as infringement on tribal self-government); Miccosukee Tribe of Indians of Florida v. Florida State Athletic Comm'n, 226 F.3d 1226, 1230 (11th Cir. 2000) (Tribe had legitimate basis for standing to challenge state's tax on non-Indian conducting business on reservation as an infringement on tribal sovereignty); Osage Nation v. Oklahoma, 597 F. Supp. 2d 1250, 1254 (N.D. Okla. 2009) ("it is well-established that Indian tribes have standing to sue to protect sovereign or quasi-sovereign interests.").  Accordingly, the Court finds that plaintiff has standing to bring this challenge.

Tax Injunction Act

Defendant State asserts that the Tax Injunction Act ("TIA"), 28 U.S.C. § 1341, bars this action.

---

[5]State statutory law provides that owners of personal property located within a municipality for at least three months must file an annual declaration with municipality for its tax assessment.  Conn. Gen. Stat. §§ 12-41 and 12-43.

TIA provides that the "district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State."  28 U.S.C. § 1362 gives the district courts original jurisdiction of all civil actions brought by recognized Indian tribes "wherein the controversy arises under the Constitution, laws, or treaties of the United States."  Indian tribes are not subject to TIA's bar in any circumstance in which the United States would not be subject to the Act if it had brought the case on behalf of the plaintiff tribe.  See Moe, 425 U.S. at 472–75.  Thus, an Indian tribe avoids the bar of TIA if it can show that it is seeking to vindicate the rights of the tribe rather than suing as a representative of an individual seeking refund of taxes.  Lac Du Flambeau Bank of Lake Superior Chippewa Indians v. Zeuske, 145 F. Supp. 2d 969, 973 (W.D. Wis. 2000).

Here, plaintiff is asserting its own right to challenge the taxing authority by the State that infringes upon its sovereignty.  TIA does not bar this suit.

Taxation as Contrary to Federal Statutes and Indian Law

Plaintiff argues that (1) the tax is preempted by the Indian Trader Statutes, 25 U.S.C. §§ 261-264, (2) the Indian Gaming Regulatory Act ("IGRA"), and (3) pursuant to the balancing test articulated in Bracker, 448 U.S. at 142-145.

Indian tribes are distinct sovereign entities that are "distinct, independent political communities retaining their original natural rights."  Worcester v. Georgia, 31 U.S. 515, 559 (1832).  States do not have authority to regulate Indian tribes where a state law is preempted by federal law or infringes upon the "right of reservation Indians to make their own laws and be ruled by them."  Bracker, 448 U.S. at 142; see Williams v. Lee, 358 U.S. 217, 220 (1959) ("absent governing Acts of Congress, the question has always

12

been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them.").

Indian Trader Statutes

The Indian Trader Statutes give the federal government exclusive authority to regulate non-Indians trading with Indians on a reservation.[6]  25 U.S.C. §§ 261-264.  Trading is defined by the statutes as "buying, selling, bartering, renting, leasing, permitting and any other transaction involving the acquisition of property or services."  25 C.F.R. § 140.5(a)(6).  The statutes "bar States from taxing federally licensed Indian traders on their sales to reservation Indians on a reservation."  Warren Trading Post Co. v. Arizona State Tax Comm'n, 380 U.S. 685, 690 (1965).  The Supreme Court reasoned that the Indian Trader Statutes and the all-inclusive regulations under them are "sufficient to show that Congress has taken the business of Indian trading on reservations so fully in hand that no room remains for state laws imposing additional burdens upon traders."  Id.

Defendants point out that this case does not involve licensed Indian traders.  However, preemption by the Indian Trader Statutes bars state authority to tax regardless of whether an entity is a licensed Indian trader because it "is the existence of the Indian Trader Statutes, . . . not their administration, that pre-empts the field of transactions with Indians occurring on reservations."  Central Machinery Co. v. Arizona

---

[6]The defense argues that the Indian Trader Statutes do not apply to Indian gaming and "flatly prohibit it."  This contention is based upon 25 C.F.R. § 140.21, which provides: "Gambling, by dice, cards or in any way whatever, is strictly prohibited in any licensed trader's store or on the premises."  This regulation does not represent a sweeping prohibition of Indian gaming as prohibits gaming only in the limited circumstance of gambling in an Indian trader store or on the premises thereof.

State Tax Comm'n, 448 U.S. 160, 165-66 (1980) ("One of the fundamental purposes of these statutes and regulations—to protect Indians from becoming victims of fraud in dealings with persons selling goods—would be easily circumvented if a seller could avoid federal regulation simply by failing to adopt a permanent place of business on a reservation or by failing to obtain a federal license.").  According to Central Machinery, the Indian Trader Statutes preempt where the contract execution, delivery and payment are effected on the reservation.  Id. at 164.

In this instance, AC Coin and WMS negotiated and signed the lease agreements with AC Coin and WMS on the Reservation, the gaming machines were delivered to the Reservation for use on the Reservation, and the lease payments are made from the Reservation with its gaming revenues.  Accordingly, the state tax that is imposed upon the non-Indian entities for the property tax on the leased equipment is preempted by the Indian Trader Statutes.

IGRA

IGRA is a "comprehensive regulatory structure for Indian gaming" that leaves no room for no state regulation of tribal gaming except as expressly authorized by IGRA and permitted by a tribal-State compact covering class III gaming.  Gaming Corp. of Am. v. Dorsey & Whitney, 88 F.3d 536, 544 (8th Cir. 1996).

IGRA provides a statutory basis for the operation of gaming by Indian tribes as means of promoting tribal economic development, self sufficiency, and strong tribal governments; 25 U.S.C. §§ 2702(1); provides that the Indian tribe has "exclusive right to regulate gaming activity on Indian lands;" 25 U.S.C. §§ 2701(5); and establishes an "independent Federal regulatory authority for gaming on Indian lands . . . necessary to

14

meet congressional concerns."  25 U.S.C. §§ 2702(3).

According to its legislative history, IGRA intends to "expressly preempt the field in governance of gaming activities on Indian lands;" and IGRA represents a "framework for the regulation of gaming activities on Indian lands which provides that in the exercise of its sovereign rights, unless a tribe affirmatively elects to have State laws and State jurisdiction extend to tribal lands, the Congress will not unilaterally impose or allow State jurisdiction on Indian lands for the regulation of Indian gaming activities."  1988 U.S.C.C.A.N. 3071, 3075-76.  The legislative history elaborates that the "mechanism for facilitating the unusual relationship in which a tribe might affirmatively seek the extension of State jurisdiction and the application of state laws to activities conducted on Indian land is a tribal-State compact."  Id.

Thus, in order to engage in class III gaming activities such as slot machines, IGRA requires a tribe to enter into a tribal-State compact to include "assessments by the State . . . to defray the costs of regulating such activity."  25 U.S.C. § 2710(d)(3)(C)(iii). However, as to state taxation of entities involved in Indian class III gaming, section 2710(d)(4) provides:

> nothing in this section shall be interpreted as conferring upon a State or any of its political subdivisions authority to impose any tax, fee, charge, or other assessment upon an Indian tribe or upon any other person or entity authorized by an Indian tribe to engage in a class III activity. No State may refuse to enter into the negotiations described in paragraph (3)(A) based upon the lack of authority in such State, or its political subdivisions, to impose such a tax, fee, charge, or other assessment.

In the event that a tribal-State compact is not reached, IGRA section 2710(d)(7)(B)(vii) provides the Secretary of the Interior with authority to establish

"procedures" to govern class III gaming.  Relevant to this case, the United States

Assistant Secretary-Indian Affairs, Department of Interior, prescribed the Gaming

Procedures by adopting, with minor modifications, the State's last proposal for a

compact with the Tribe.

Relevant to the Tribe's class III gaming, the Gaming Procedures provide the

State with certain regulatory authority to oversee class III gaming.  The State is

authorized to license gaming employees; vendors must have a valid gaming services

registration issued by the State prior to the provision of any gaming equipment.

Additionally, the State must approve standards for operation of any video facsimile

games, including slot machines, and the State may bar any entities determined to pose

a threat to the effective regulation of gaming from doing business with the Tribe.

The Gaming Procedures also require the Tribe to reimburse the State for its

regulatory and law enforcement relevant to the gaming operations.  Additionally,

pursuant to the subsequent MOU, the Tribe also pays 25% of its video facsimile

revenue to the State.  The Gaming Procedures do not provide for state regulation

through the form of a Town property tax on the gaming equipment within the Tribe's

Reservation.

Defendant Town argues that Section 2710(d)(4) does not govern the issue of

taxation on the vendors because the vendors are leasing gaming machines to the Tribe

but are not engaged in class III gaming activity.  The Town posits that IGRA preemption

should not be extended to commercial activity remotely related to Indian gaming.  In

advancing its argument, defendant relies upon Barona Band of Mission Indians, which

held that IGRA did not preempt sales taxes imposed on third-party purchases of

16

equipment used to construct a casino.  528 F.3d at 1193.   In Barona, the Ninth Circuit reasoned that IGRA's preemption scope should not be stretched beyond the statute's objective "to regulate how Indian casinos function," thereby assuring the fair gaming by both the operators and players.  Id.; 25 U.S.C. § 2702(2).  In so concluding, the court noted that IGRA should not be held to preempt any commercial activity remotely related to Indian gaming, such as employment contracts, food service contracts, and innkeeper codes.  See also Casino Resource Corp. v. Harrah's Entertainment, Inc., 243 F.3d 435, 439 (8th Cir. 2001) (service contract dispute between non-Indian general contractor and non-Indian sub-contractor was outside of IGRA's protective structure).

However, the instant commercial activity, the leasing of class III gaming equipment, is not peripheral to IGRA's core objective, the regulation of the functioning of the Tribe's casino.  The fact that the Gaming Procedures afford the State authority to register and investigate vendors of the class III gaming equipment reflects that the leasing of the equipment is within IGRA's protective framework and constitutes engaging in class III gaming.

Pursuant to the clear language of Section 2710(d), the State's authority with respect to class III gaming is prescribed by the Gaming Procedures.  The Gaming Procedures provide for certain state taxes such as a tax on the retail sale of alcoholic beverages that the Tribe is required to collect; however, the Gaming Procedures lack language providing for property taxing authority.  Thus, consistent with IGRA's comprehensive framework for regulation of Indian gaming, the Court finds that the property tax on the leased gaming equipment is preempted.

17

Bracker Balancing Test

The Tribe argues that the tax is invalid under the Bracker test that balances the

relevant state, federal and tribal interests.  Defendants counter that (1) the federal

regulatory schemes are not implicated by the tax; (2) the tax represents a non-existent

or indirect economic burden on the Tribe; (3) such property taxes have been historically

permitted; and (4) the State has a strong interest in ensuring compliance with its laws,

ensuring its regulation of the gaming industry, while the Town has an interest in funding

its provision of services to the Tribe.

Bracker provided a test to determine "difficult questions" where a state asserts

authority over the conduct of non-Indians engaging in activity on a tribe's reservation.

448 U.S. at 144.  "State jurisdiction is preempted by the operation of federal law if it

interferes or is incompatible with federal and tribal interests reflected in federal law,

unless the State interests at stake are sufficient to justify the assertion of State

authority."  New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 334 (1983).

In Ramah Navajo School Board, the Supreme Court elaborated:

The State's interest in exercising its regulatory authority over the activity in
question must be given appropriate weight.  Pre-emption analysis in this
area is not controlled by mechanical or absolute conceptions of state or
tribal sovereignty; it requires a particularized examination of the relevant
state, federal and tribal interests.  The question whether federal law, which
reflects the related federal and tribal interests, pre-empts the State's
exercise of its regulatory authority is not controlled by standards of pre-
emption developed in other areas.  Instead, the traditional notions of tribal
sovereignty, and the recognition and encouragement of this sovereignty in
congressional Acts promoting tribal independence and economic
development, inform the pre-emption analysis that governs this inquiry.
Relevant federal statutes and treaties must be examined in light of the
broad policies that underlie them and the notions of sovereignty that have
developed from historical traditions of tribal independence. As a result,
ambiguities in federal law should be construed generously, and federal

18

pre-emption is not limited to those situations where Congress has explicitly announced an intention to pre-empt state activity.

458 U.S. at 838 (citations and quotations omitted).

In determining whether a state tax borne by non-Indians is preempted, courts should consider factors including the degree of federal regulation at issue, the governmental interests of the tribes and states (regulatory and revenue raising), and the provision of tribal or state services to the party the state seeks to tax. Salt River Pima-Maricopa Indian Cmty. v. State of Ariz., 50 F.3d 734, 736 (9th Cir. 1995); Confederated Tribes of Chealis Reservation v. Thurston County Bd. of Equalization, 2010 WL 1406524, *6 (W.D. Wash.). Most recently, the Tenth Circuit observed that the Supreme Court has focused on three factors when applying Bracker's flexible preemption analysis: (1) the extent of the federal and tribal regulations governing the taxed activity; (2) whether the "economic burden" of the tax falls on the tribe or the non-Indian individual or entity; and (3) the extent of the state interest justifying the imposition of the taxes. Ute Mountain Ute Tribe v. Rodriguez, 660 F.3d 1177, 1187 (10th Cir. 2011). Generally, a state tax is unlawful if it intrudes on federal government regulation intended to benefit a tribe, burdens reservation value in which the tribe has a significant interest, places an economic burden on the tribe, and is imposed without relation to a state service provided on the reservation to the taxpayer or to the activity burdened by the tax.

Review of the Bracker factors militates in favor of the tribe.

19

Federal Interest

Tribal economic development is well recognized as an important federal interest. California v. Cabazon Band of Mission Indians, 480 U.S. 202, 217 n.20 (1987). However, a federal interest in tribal economic self-sufficiency cannot alone defeat a state tax on non-Indians. See Gila River Indian Community v. Waddell, 91 F.3d 1232, 1237 (9th Cir. 1997) (tribal economic self-sufficiency is not an overriding force preempting an otherwise valid state tax on non-Indians).

In this case, the federal interest in self-sufficiency is coupled with two comprehensive regulatory schemes.  As previously discussed, the tax on the leased gaming equipment affects Indian traders and Indian gaming, and the Federal Government has established comprehensive regulation of both Indian traders and Indian gaming through enactment of the Indian Trader Statutes and IGRA.  The federal interest is considered strongest when a comprehensive and pervasive regulatory scheme governs the activity burdened by the state tax.  Ramah, 458 U.S. at 839-841 ("the direction and supervision provided by the Federal Government for the construction of Indian schools leave no room for the additional burden sought to be imposed by the State through its taxation..."); Bracker, 448 U.S. at 145 ("At the outset we observe that the Federal Government's regulation of the harvesting of Indian timber is comprehensive.").

Here, the federal interest in tribal economic development and its two comprehensive regulatory schemes is substantial.  IGRA reflects the strong federal interest in regulating Indian gaming to ensure that the Indian tribe is the primary beneficiary of the gaming operation, thereby promoting tribal economic development,

20

self-sufficiency, and strong tribal governments.  <u>Yavapai-Prescott Indian Tribe v. Scott</u>, 117 F.3d 1107, 1115-1116 (9th Cir. 1997).  Relevant to the Indian Trader Statutes, the Supreme Court has noted that their existence, rather than their administration, "pre-empts the field of transactions with Indians occurring on reservations."  <u>Central Machinery</u>, 448 U.S. at 165.  In light of these comprehensive federal regulatory schemes, the Court finds the federal interest at stake is substantial.

<u>Tribe's Interest</u>

Similarly, the Tribe has a strong interest in its ability to self-govern as facilitated by the economic revenue generated by the gaming activities.  The Supreme Court has recognized that tribal gaming is a means to fund "the operation of the tribal governments and the provision of tribal services" and a major source of on-reservation employment.  <u>Cabazon</u>, 480 U.S. at 218-20.

The Tribe maintains that it is contractually obligated to reimburse the vendors and bears the economic burden of the tax.  Defendants complain that the Tribe cannot claim a burden because the tax is on the vendors and the Tribe agreed to reimburse the vendors for such expense by contract.  However, the Tribe's decision to indemnify the vendors does not compel a finding that the tax poses an indirect or self-inflicted burden on the Tribe.  The Tribe has submitted expert testimony that such indemnification provisions are standard industry practice.  Defendants have not provided any evidence to the contrary.

However, the issue of whether the reimbursement of the taxes is standard industry practices in leasing gaming equipment is not alone dispositive to the determination of the economic burden.  Taxes on non-Indian entities that can be passed

21

on to the Tribe have not been historically upheld.  Unlike the situation where a non-Indian purchaser or lessee bears the burden of the tax, see Cotton Petroleum Corp. v. New Mexico, 490 U.S. 163, 186 (1989); Ute Mountain Ute Tribe, 660 F.3d at 1183, a vendor can shift the expense of the tax to the Tribe.  Consonant with this principle, Supreme Court precedent has recognized as direct burdens state taxes on non-Indians that can be passed along to the Indian tribe.  See Ramah, 458 U.S. at 844; Bracker, 448 U.S. at 151.  In both Ramah and Bracker, the Indian tribe had agreed contractually to reimburse the non-Indian for the expense of the tax.  Here, as in Ramah and Bracker, the economic burden of the tax ultimately falls on the Tribe.  As such, the tax cannot be characterized as an indirect burden.  In Cotton Petroleum, the Supreme Court recognized that the tax on non-Indian lessees on Indian land had a marginal effect on the demand for on-reservation leases, the value to the Tribe of those leases and the ability of the Tribe to increase its tax rate, but that such burden was too indirect to justify preemption.  490 U.S. at 186.  Here, the Tribe bears the direct burden of ultimately bearing the cost of the taxes, which infringes upon the revenue generated by the Tribe's gaming, the Tribe's chief source of income.  Accordingly, the Tribe's substantial interest weighs against the imposition of the tax.

State/Town Interest

The Court must next consider whether the taxing authority can "identify any regulatory function or service that would justify the assessment" of the tax at issue. Bracker, 448 U.S. at 148-149.  The State asserts that it has a strong interest in the integrity of its tax system, which funds local governments through imposition of a property tax, and it asserts that it provides regulatory oversight of the Indian gaming

22

pursuant to IGRA.  The Town posits that it has a strong interest in the tax, which funds the services to the Tribe such as education of the Tribe's children, bussing for tribal children and road maintenance to provide access to the Reservation.  Further, the Town also asserts an interest in ensuring compliance with the property tax law.

"The exercise of State authority which imposes additional burdens on a tribal enterprise must ordinarily be justified by functions or services performed by the State in connection with the on-reservation activity."  Mescalero Apache Tribe, 462 U.S. at 336. The state interest strengthens when there is a nexus between the taxed activity and the government function provided.  Ute Mountain Ute Tribe, 660 F.3d at 1201.

In this instance, the State and Town interests in the tax do not vindicate its imposition.  The State's regulation of the gaming is funded by the amount the Tribe provides to the State pursuant to the Gaming Procedures.  The State and Town's interest in compliance with the property tax on the vendors is diminished by the existence of legal precedent that had previously rendered the tax questionable and this decision finding the tax to be improper.

The Town's interest in funding the education and bussing of the Tribe's children is weak because such services have no nexus to the taxed activity of gaming or even leasing gaming equipment.  The maintenance of the roads to the Reservation has some connection to the taxed activity because the leased gaming equipment was brought onto the Reservation by way of the roads and the individuals who use the gaming equipment also use the roads to the Reservation.  However, even if the Tribe did not lease the gaming equipment, the Town would need to maintain roads to provide access to the Reservation for individuals living on and off the Reservation.  Thus, the State and

Town's interest in taxing the leased equipment fails to justify the economic burden on the Tribe that compromises substantial federal and Tribal interests in tribal self-determination and self-government pursuant to comprehensive federal regulation.  The tax is preempted pursuant to <u>Bracker</u> balancing.

The motion for summary judgment will be granted in favor of the Tribe.  The motions for summary judgment filed by the State and the Town will be denied.

## **CONCLUSION**

For the foregoing reasons, the motion in limine is DENIED [doc. #220]; the Tribe's motion for summary judgment is GRANTED [doc. #215]; the State's motion for summary judgment is DENIED [doc. #213]; and the Town's motion for summary judgment is DENIED [doc. #214].


Dated this 27th day of March, 2012 in Bridgeport, Connecticut.


_____/s/_____
Warren W. Eginton,
Senior U.S. District Judge